**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| NATECIA WASHINGTON,  ) | CASE NO.  1:13-CV-564 |
| o.b.o. J.W.,  ) | |
|  ) | |
| Plaintiff,  ) | MAGISTRATE JUDGE |
|  ) | VECCHIARELLI |
| v.  ) | |
|  ) | |
| CAROLYN W. COLVIN,  ) | |
| Acting Commissioner of Social  ) | |
| Security,  ) | **MEMORANDUM OPINION AND** |
|  ) | **ORDER** |
| Defendant.  ) | |

Plaintiff, Natecia Washington ("Plaintiff"), challenges the final decision of Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), determining that Plaintiff's son, J.W. ("Claimant"), is no longer disabled.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

### I.  PROCEDURAL HISTORY

On August 1, 2001, the Agency determined that Claimant was disabled as of March 1, 2001.  (Transcript ("Tr.") 17.)  On May 23, 2005, the Agency determined that Claimant was no longer disabled as of May 1, 2005.  (*Id.*)  A state agency disability hearing officer upheld that determination, and Plaintiff filed a request for a hearing before an administrative law judge ("ALJ"), who conducted a hearing on March 4, 2010.

(*Id.*)  Plaintiff, *pro se*, appeared and testified, as did an impartial medical expert.  (*Id.*)  On April 16, 2010, the ALJ determined that Claimant's disability ended on May 1, 2005 and that Claimant had not become disabled again after that date.  (Tr. 17-31.)  On July 7, 2012, the Appeals Council denied Plaintiff's request for review and the ALJ's decision became the Commissioner's final decision.  (Tr. 10.)

On March 15, 2013, after receiving an extension of time within which to do so, Plaintiff, through counsel, filed her Complaint in this Court, challenging the final decision of the Commissioner.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 18, 19, 20.)  Plaintiff asserts that the ALJ erred in: (1) failing to adequately develop the record; and (2) relying on the testimony of the medical expert.

## II.  EVIDENCE

### A.  Personal and Academic Evidence

Claimant was born on April 21, 2000.  (Tr. 22.)  In April 2005, his special education teacher, LaRita Green-Brown, completed a teacher questionnaire.  (Tr. 296-303.)  She noted that Claimant was in pre-kindergarten, and that his reading, mathematics and written language instruction was at the pre-kindergarten level, and that he received occupational therapy consultation and special education services.  (Tr. 296.)  Ms. Green-Brown opined that Claimant had no limitations in the domains of: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; and caring for himself.  (Tr. 297-301.)  She noted that Claimant "takes medication at home to help him control his behavior," and that, before the medication, Claimant "talked loud[ly] 85% of class time" and had "several meltdowns."  (Tr. 302.)  However, on the medication, Claimant "talks in

an appropriate tone of voice and has not experienced any more melt dow[n]s at school." (*Id.*)

In a December 2006 disability report, Plaintiff noted that, as Claimant "gets older it gets more difficult for him to stay focused, stop talking, sit still at home and in school. Meds help control the attention span."  (Tr. 316.)

In February 2007, Claimant's teacher, Bernadette Robinson, who taught Claimant science, social studies and math, completed a teacher questionnaire.  (Tr. 319-27.)  In the domain of acquiring and using information, she opined that Claimant had a very serious problem in: expressing ideas in written form; reading and comprehending written material; comprehending and doing math problems; understanding and participating in class discussions; providing organized oral explanations and adequate descriptions; and applying problem-solving skills in class discussions.  (Tr. 320.)  She opined that he had an obvious problem in: comprehending oral instructions; understanding school and content vocabulary; learning new material; and recalling and applying previously learned material.  (*Id.*)

In the domain of attending and completing tasks, Ms. Robinson opined that Claimant had a serious problem in carrying out multi-step instructions, and an obvious problem in: paying attention when spoken to directly; focusing long enough to finish assigned activity or task; refocusing to task when necessary; changing from one activity to another without being disruptive; and completing work accurately without careless mistakes.  (Tr. 321.)    According to Ms. Robinson, Claimant had a slight problem in: carrying out single-step instructions; waiting to take turns; completing class/homework assignments; working without distracting himself or others; and working at a reasonable

3

pace/finishing on time.  (*Id.*)  She indicated that each of these problems occurred on a weekly basis.  (*Id.*)

In the domain of interacting and relating with others, Ms. Robinson opined that Claimant had: a serious problem using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation.  (Tr. 322.)  She assigned him a slight problem in: seeking attention appropriately; relating experiences and telling stories; using language appropriate to the situation and listener; introducing and maintaining relevant and appropriate topics of conversation; taking turns in a conversation; and interpreting the meaning of facial expression, body language, hints and sarcasm.  (*Id.*)  Ms. Robinson indicated that Claimant experienced these problems on a weekly basis.  (*Id.*)

Ms. Robinson indicated that Claimant had no problems in the domains of moving about and manipulating objects, and caring for himself.  (Tr. 323-24.)  She noted that Claimant was "much calmer and more focused after taking medication."  (Tr. 325.)

In September 2008, when Claimant was in the third grade, his elementary school completed a multidisciplinary evaluation team report after his special education teacher referred Claimant for evaluation under the Individuals with Disabilities Education Act ("IDEA").  (Tr. 327-33.)  According to the report, Claimant achieved grade equivalency scores of : 1.2 in letter-word identification (below average); 3.8 in calculation (high average); 1.3 in spelling (low average); 1.4 in passage comprehension (low average) ; and 1.3 in writing samples (low average), with an overall academic skill level of 1.7 (low average).  (Tr. 329.)  The report concluded that Claimant was eligible for special education services on the basis of his ADHD:

4

> [Claimant's] ADHD results in decreased attention [and] concentration, poor impulse control, difficulty following directions, and poor task completion. He may have difficulty following directions at times. Parent reports that [Claimant] exhibits severe temper outbursts and poor anger control when current medication is not taken consistently.

(Tr. 336.)

In October 2009, when Claimant was repeating third grade, school officials completed an Individualized Education Plan ("IEP") assessment, which reflected that Claimant was functioning at an early-to-mid second grade level in reading and writing, and at a third-grade level in math. (Tr. 367.) The report noted that Claimant was "performing much better academically and behaviorally this school year," and that his "improvements make his ability to learn a lot greater than it was in past years. His lack of frustration with reading has improved his confidence and willingness to perform in the classroom." (*Id.*) In a March 2010 IEP progress report, Claimant's teacher noted that his handwriting and writing samples had "improved a lot," but that he was not yet functioning at grade level. (Tr. 406.) Claimant was "doing well" in math, but had not made significant improvement in reading. (*Id.*)

**B.     Medical Evidence**

in April 2001, Claimant began occupational therapy with Infant Family Services. (Tr. 477.) In a January 2002 final report, his therapist noted that Claimant had "made gains in all developmental areas, especially in fine motor, cognition, speech and feeding." (*Id.*) Claimant was described as "aggressive" during peer interaction. (*Id.*)

In August 2001, Hillel Naon, M.D., examined Claimant – who was then 27 months old – noting Plaintiff's complaint that Claimant was having difficulty eating and

5

was not growing. (Tr. 464.) Dr. Naon determined that Claimant's "nutritional status [was] satisfactory and he appear[ed] to have an adequate oral intake." (Tr. 465.) She recommended that Plaintiff feed Claimant Pediasure with fiber. (*Id.*)

In February 2003, psychologist Sandra Pisano-Cruz, Psy.D., examined Claimant at the request of a local services center to determine his eligibility for assistance. (Tr. 491.) Claimant was two years and 10 months old. (Tr. 492.) Dr. Pisano-Cruz opined that Claimant had average intelligence with "significant language delays," with borderline or low average scores in communication/language functioning, social functioning, sensory/motor functioning, and self care. (Tr. 493-94.) She diagnosed Claimant with disruptive behavior disorder and expressive language disorder. (Tr. 494.)

In February 2005, an examiner at Greater Long Beach Child Guidance Center diagnosed Claimant with ADHD. (Tr. 739.) In January 2005, a staff psychiatrist at Long Beach Child and Adolescent Center prescribed Claimant Adderall, and thereafter noted that Claimant's attention span and hyperactivity had improved on the medication. (tr. 660.)

On June 21, 2005, Sarah Sela-Herman, M.D., performed an esophagogastroduodenoscopy on Claimant, after Plaintiff reported that Claimant experience abdominal pain after eating, a cough with phlegm and some gagging with eating. (Tr. 601.) Dr. Sela-Herman noted that Claimant had a history of difficulty eating solids and failure to gain weight, dating back to 23 months of age. (Tr. 600.) She noted that, in August 2002, she had diagnosed Claimant with erosive esophagitis and mild gastritis, and, in February 2003, prescribed Prilosec. (*Id.*) After the June 2005 exam, Dr. Sela-Herman diagnosed Claimant with erosive esophagitis and mild to moderate

6

hiatal hernia.  (Tr. 602.)  She instructed Plaintiff to continue the Prisolec, and prescribed Carafate to expedite the healing of the erosions in Claimant's esophagus.  (*Id.*)

In December 2005, psychiatrist Farhad K. Yaghoubi, M.D., authored a letter stating that he had been treating Claimant since December 2004.  (Tr. 639.)[1]  Dr. Yaghoubi noted that Claimant's "current working diagnosis is Attention Deficit Hyperactivity Disorder-Combined Type," and that Claimant was taking Adderall.  (*Id.*)

In March 2006, Terry S. Schwartz, D.O., examined Claimant and diagnosed him with ADHD.  (Tr. 802-03.)  He prescribed Adderall.  (Tr. 803.)  In December 2006, Dr. Schwartz, who had seen Claimant every two months for prescription refills, discontinued Claimant's Adderall and prescribed Concerta.  (Tr. 772.)  The record does not reflect the reasons Dr. Schwartz changed Claimant's medication.

**C.     Agency Reports and Assessments**

On April 20, 2005, agency consulting psychologist Rosa Colonna, Ph. D., examined Claimant, who was then four years and 11 months old.  (Tr. 589-93.)  Dr. Colonna opined that Claimant's intellectual functioning was low average, and that he had mildly diminished immediate memory, insight and judgment.  (Tr. 591.)  The Weschler Preschool of Primary Scale of Intelligence-Revised ("WPPSI-R") revealed a performance IQ of 89, a verbal IQ of 83, and a full scale IQ of 84.  (Tr. 591-92.)  Dr. Colonna opined that Claimant's overall cognitive functioning was in the low average range, and that Claimant had: a slight inability to initiate and use language in an age-appropriate manner; and a moderate inability to interact with peers and adults in an

---

[1] Dr. Yaghoubi's treatment notes are included in the record.  (Tr. 649-59.)  Those notes are handwritten, however, and are generally illegible.

7

age-appropriate manner.  (Tr. 592.)

On May 3, 2005, agency consulting physician Efren S. Valenzuela, M.D., examined Claimant.  (Tr. 594-96.)  He noted Plaintiff's report that Claimant had a history of gastroesophageal reflux disease ("GERD") and ADHD.  (Tr. 594.)  Plaintiff reported that Claimant was taking Prilosec to control the GERD and that he experienced occasional gagging while eating, but was otherwise stable.  (*Id.*)  Claimant was taking Adderall to control his ADHD, "with significant improvement noted both at home and at school."  (*Id.*)  Dr. Valenzuela diagnosed Claimant with ADHD and a history of gastroesophageal reflux, stable.  (Tr. 596.)  He opined that Claimant's conditions "do not seem to cause any significant impairment in his overall functioning, which is currently at a level grossly appropriate for [Claimant's] age of five years."  (*Id.*)

On May 19, 2005, agency consulting physician Donald M. Montgomery completed a childhood disability evaluation form.  (Tr. 583-88.)  He assigned Claimant less than marked limitations in the domains of: moving about and manipulating objects; caring for himself; and health and physical well-being.  (Tr. 585.)  Dr. Montgomery concluded that Plaintiff had no limitations in the domains of: acquiring and using information; attending and completing tasks; and interacting and relating with others. (Tr. 587.)

In March 2007, agency consultants Eva Harris, M.D., and John Petzelt, Ph.D., completed a childhood disability review form.  (Tr. 742-47.)  They assigned Claimant a less than marked limitation in the domains of: acquiring and using information; and attending and completing tasks.  (Tr. 744-45.)  They determined that he had no limitations in the domains of: interacting and relating with others; moving about and

8

manipulating objects; caring for himself; and health and physical well-being. (Tr. 744-45.)

**D.    Hearing Testimony**

Claimant's administrative hearing was originally scheduled for November 2, 2009. (Tr. 971.) At that time, however, the ALJ postponed the hearing to allow Plaintiff time to obtain representation and additional medical records. (Tr. 971-82.) Plaintiff appeared *pro se* at Claimant's March 4, 2010 hearing. (Tr. 985-86.)

**1.    Medical Expert's Testimony**

Daniel H. Wiseman, M.D., a pediatrician, testified as a medical expert at Claimant's March 2010 administrative hearing. (Tr. 987.) He informed the ALJ that, shortly before the hearing, he had received "about 15, 20 pages worth of faxed material" that he had not yet reviewed. (Tr. 989.) Dr. Wiseman indicated, however, that he had received and reviewed records from the "E" section of the administrative transcript – which contains Claimant's school records and Plaintiff's reports to the Agency – and records from the "F" section of the administrative transcript – which contains Claimant's medical records. (*Id.*) He noted that the "F" section of the transcript contained exhibits numbering into the forties. (*Id.*)

Dr. Wiseman described Claimant's medical records from birth, noting that Claimant had feeding problems and nutritional difficulties, as well as a family history that involved frequent relocations. (Tr. 991-92.) Dr. Wiseman noted that Claimant had a learning disability, and had difficulties in school and in intellectual functioning. (Tr. 992.) Dr. Wiseman opined, however, that Claimant's impairments did not satisfy the requirements of any of the Listings. (Tr. 995.)

Dr. Wiseman opined that Claimant had a less than marked limitation in acquiring and using information, and interacting and relating with others. (Tr. 996-97, 998.) He assigned Claimant a marked limitation in attending and completing tasks. (Tr. 997.) Dr. Wiseman did not assign specific limitations in the remaining domains, but observed that Claimant was not generally not impaired in those domains:

> We don't have any information about [Claimant's] ability to manipulate objects or his gross and fine motor skills, [and] caring for himself seems to be satisfactory. He comes adequately and cleanly dressed to his various locations. His general health and physical well being are impaired, but not . . . to the marked degree.

(Tr. 998.)

### 2. Plaintiff's Testimony

At the conclusion of Dr. Wiseman's testimony, the ALJ explained to Plaintiff that she had the right to ask Dr. Wiseman questions:

> [Y]ou have the right to ask questions of the doctor. You are not required to. I have not listened to you as yet. If I take the doctor's testimony as is without listening to what you have to say about [Claimant's] functioning, et cetera, I'd have to deny the case, but I haven't listened to you yet. . . . You're almost there, but not quite.

(Tr. 998-99.) Plaintiff pointed out out that Claimant required medication to be able to learn and function in school, and that physicians had increased Claimant's dosage as he aged. (Tr. 999-1000.) The ALJ interjected, however, and explained that the relevant issue was "how [Claimant] does on his medications." (Tr. 1000.) Plaintiff indicated that she did not have any questions for Dr. Wiseman. (Tr. 1001.)

The ALJ spent much of the hearing explaining the standard of review and the review process to Plaintiff. (Tr. 1005-007, 1009-14.) When she testified, Plaintiff

testified as follows:

> Claimant was in third grade, but he was supposed to be in fourth grade. (Tr. 1003.) He had been taking medication for ADHD since he was four years old. (Tr. 1004.) Claimant was still drinking Pediasure. (Tr. 1008.) He ate foods like peanut butter and jelly, but did not eat very much. (*Id.*) Although Claimant's digestive issues had improved, Claimant was frightened that they would return and he would have to undergo more tests. (*Id.*) Claimant got along with others "okay." (Tr. 1012.)

### III.  STANDARD FOR DISABILITY

The Agency periodically reviews a child-claimant's eligibility for benefits, using a three-step process. 20 C.F.R. § 416.994a(a). At step one, the Commissioner considers whether there has a been "a medical improvement" in the impairment or impairments that the claimant had at the time of the most recent medical determination that the claimant was disabled (the comparison point decision, or "CPD"). 20 C.F.R. § 416.994a(b)(1). If not, with certain exceptions that are irrelevant here, the claimant is disabled. *Id*. If there has been medical improvement in the claimant's impairments, the analysis continues to step two, which asks whether the claimant's impairments still meet or medically equal the severity of the listed impairment that it met or medically equaled at the time of the CPD. 20 C.F.R. § 416.994a(b)(2). If the claimant's impairments still meet or medically equal the severity of the listed impairments from the time of the CPD, the claimant is still disabled. *Id*. If the impairments do not meet or medically equal the impairments from the CPD, the analysis continues to the third step, which requires the Agency to determine whether the claimant is currently disabled under the rules in 20 C.F.R. §§ 416.924(c) and (d). 20 C.F.R. § 416.924a(b)(3).

11

Under §§ 416.924(c) and (d), a child-claimant is disabled if: (1) he has a severe impairment or combination of impairments; and (2) the impairment meets or medically equals the severity of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"); or (3) the impairment functionally equals the Listings, as described in 20 C.F.R. § 416.926a.  20 C.F.R. § 416.924a(b)(3)(i)-(iii).

To determine whether a child-claimant's impairment functionally equals the Listings, the Commissioner assesses the functional limitations caused by the impairment in six domains of functioning:  (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being.  20 C.F.R. § 416.926a.  An impairment functionally equals the Listings if the child has a "marked" limitation in two domains, or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a(a).  A "marked" limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i).  An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).

### IV.   SUMMARY OF COMMISSIONER'S DECISION

In his April 16, 2010 decision, the ALJ made the following findings of fact and conclusions of law:

1. The CPD was dated August 1, 2001.

2. At the time of the CPD, Claimant had the following medically determinable impairments: developmental and emotional disorder and speech/hearing delay.  These impairments were found to meet

12

        section 112.05D of the Listings.

3. Medical improvement occured as of May 1, 2005.

4. Since May 1, 2005, the impairments that Clamaint had at the time of the CPD have not met or medically equaled section 112.05D of the Listings as that section was written at the time of the CPD.

5. Claimant was born on April 21, 2000. Therefore, he was a preschooler as of May 1, 2005, and was a school-age child at the time of the ALJ's decision.

6. Since May 1, 2005, the impairments that Claimant had at the time of the CPD have not functionally equaled the Listing of Impairments.

7. The medical and other evidence establishes that Claimant: (1) did not have an impairment at the CPD that was not considered at that time; and (2) has not developed any additional impairments subsequent to the CPD.

8. Since May 1, 2005, Claimant has not had an impairment or combination of impairments that meets or medically equals one of the Listings.

9. Since May 1, 2005, Claimant has not had an impairment or combination of impairments that functionally equals the Listings.

10. Claimant's disability ended as of May 1, 2005 and Claimant has not become disabled again since that date.

(Tr. 20-31.) With respect to the domains of functioning, the ALJ determined that Claimant had less than marked limitations in acquiring and using information, health and physical well-being, and interacting and relating with others; marked limitations in attending and completing tasks; and no limitations in moving about and manipulating objects, and caring for himself. (Tr. 24-30.)

## V. LAW & ANALYSIS

**A. Standard of Review**

13

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). Courts may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether that evidence has actually been cited by the ALJ. *Id.* However, courts do not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681.

**B.     Plaintiff's Assignments of Error**

Plaintiff argues that the ALJ erred in: (1) failing to fully and fairly develop the record; and (2) relying on Dr. Wiseman's testimony. The Commissioner responds that the ALJ did not err and that substantial evidence supports his decision in this case.

   **1.     Whether the ALJ Fully Developed the Record**

Plaintiff contends that the ALJ failed to fully and fairly develop the record in this

matter when he failed to ask Plaintiff "meaningful questions" about Claimant's ADHD. Plaintiff points to her *pro se* status at the administrative hearing and argues that, absent further questioning regarding Claimant's condition, the ALJ did not develop "a full understanding of the limitations caused by" Claimant's "inattentiveness and impulsivity." (Plaintiff's Brief ("Pl. Br.") at 15-16.

In support of her argument, Plaintiff points to the Sixth Circuit's decision in [Lashley v. Secy' of Health & Human Servs, 708 F.2d 1048 (6th Cir. 1983)](). In that case, the claimant appeared *pro se* at his administrative hearing, which lasted 25 minutes and during which the ALJ asked the claimant limited, superficial questions regarding his abilities.  The Sixth Circuit determined that the ALJ had failed in his duty to "develop a full and fair record," noting that an ALJ's "basic obligation to develop a full and fair record rises to a special duty when an unrepresented claimant unfamiliar with hearing procedures appeals before him," and that "[t]o satisfy this special duty the administrative law judge must scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." [708 F.2d at 1051-52]() (internal quotation marks and citations omitted).

Plaintiff's argument fails, as neither *Lashley* nor any other legal authority compel the conclusion that the ALJ in this case failed to adequately develop the record. Plaintiff's reliance on *Lashley* is misplaced, as the facts of this case are distinguishable from the facts in that case.  In *Lashley*, the *pro se* claimant was testifying on his own behalf, and had suffered multiple strokes and other impairments that had result in neurological deficits that were apparent from the record.  In this case, although Claimant has a history of learning disabilities and ADHD, nothing in the record suggests that

Plaintiff has any cognitive or intellectual impairments, or that she was otherwise incapable of advocating on her son's behalf.  Rather, the record reflects that Plaintiff submitted detailed, lengthy reports regarding Claimant's condition (tr. 273-80, 281-87), provided accurate and detailed lists of his medical treatment and physicians (tr. 292-94), and worked with his teachers, counselors and physicians to obtain Claimant's treatment and IEP (tr. 334, 361, 375).

Further, "the mere fact that a claimant is unrepresented is not grounds for reversal."  *Born v. Sec'y of Health & Human Servs.*, 923 F.2d 1168, 1172 (6th Cir. 1990).  Rather, in this context, the relevant question is whether "the hearing in the . . . case resulted in unfair or unsupported conclusions."  *Id*.  In this case, other than asserting the unsupported conclusion that the ALJ failed to sufficiently question Plaintiff regarding Claimant's condition, Plaintiff offers no argument that the ALJ's conclusion was unsupported.  Indeed, Plaintiff points to nothing in the record that suggests that Claimant was more limited or had a more severe impairment than the ALJ determined.  Rather, the record substantially supports the ALJ's conclusion in this case, as the medical and educational records show that Claimant improved with medication and treatment.  Absent some evidence that contradicts or undermines the ALJ's determination that Claimant was no longer disabled, the mere fact that the ALJ briefly questioned Plaintiff during the administrative hearing is not sufficient to merit remand in this case.  See *Born*, 923 F.2d at 1172 ("In the present case, although the ALJ did not question claimant extensively about his subjective complaints of disabling pain, there was no discrepancy in the record concerning the objective evidence of his alleged disability which the ALJ had to resolve as the ALJ in *Lashley* did.")

16

### 2. Whether the ALJ Erred in Relying on Dr. Wiseman's Testimony

Plaintiff argues that the ALJ erred in relying on Dr. Wiseman's testimony because Dr. Wiseman had not reviewed the entire record before testifying. Specifically, Plaintiff points to Dr. Wiseman's statement that, just prior to the hearing, he had received 15 to 20 pages of records that he had not yet reviewed. Plaintiff argues that remand is warranted because "[w]hether Dr. Wiseman's opinion would have been different had he be[en] given the other medical reports is not known." (Pl. Br. 17.) The Commissioner responds that, because the record substantially supports the ALJ's decision, this argument lacks merit.

Plaintiff's argument is not well taken. Although it arguably would have been the better course for the ALJ in this matter to allow Dr. Wiseman time to review the additional records, Plaintiff offers no basis for concluding that Dr. Wiseman's opinion would have been different after such review, or that, if Dr. Wiseman had offered different testimony, the ALJ would have concluded that Claimant was disabled. Although the ALJ relied on Dr. Wiseman's testimony in reaching his conclusion, the ALJ's decision reflects that he also reviewed, considered and discussed the evidence in the record. Plaintiff points to no evidence in the record that undermines either Dr. Wiseman's testimony or the ALJ's determination regarding Claimant's abilities in the domains of functioning. Indeed, Dr. Wiseman and the ALJ assigned Claimant greater limitations – marked limitations in acquiring and using information – than the state agency consultants, who assigned him less than marked or no limitations in all domains of functioning. Absent some evidence that Dr. Wiseman's review of the additional materials would have changed the outcome of Claimant's case, this argument presents

17

no basis for remand in this matter.

### VI.　CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

*s/ Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: October 28, 2013